UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT E. ROCAFORT,

    Petitioner,

v.

Case No. 1:06-cv-476
Hon. Robert J. Jonker

CINDI S. CURTIN,

    Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner, a prisoner currently incarcerated at a Michigan correctional facility, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**I.    Background**

After a jury trial, petitioner was convicted of the first-degree, premeditated murder of a woman who lived in his apartment building and whose bound and strangled body was found in the woods nearby. M.C.L. § 750.316. Petitioner was sentenced to life imprisonment. *People v. Rocafort*, No. 257031 (Mich. App. Dec. 27, 2005). Petitioner, through counsel, presented five issues in his direct appeal to the Michigan Court of Appeals:

    I.    Should the conviction be overturned because there was insufficient credible evidence to prove that [petitioner] committed the crimes charged?

    II.    Did the trial court reversibly err by allowing into evidence hearsay and prejudicial testimony of prior statements by the deceased, allowing testimony about DNA results into evidence without a proper foundation, refusing to exclude video evidence, and failing to grant a motion for directed verdict, and was [petitioner] thus denied his due process and constitutional rights under the Michigan and United States Constitutions?

      III.      Did the prosecutor's actions deny [petitioner] a fair trial and his due process rights under the Michigan and Federal Constitutions?

      IV.      Did the prosecutor's actions deny [petitioner] a fair trial and his due process rights under the Michigan and Federal Constitutions?

      V.      Should petitioner get a new trial?

Brief on Appeal (docket no. 23). The Michigan Court of Appeals affirmed the convictions. *People v. Rocafort*, No. 257031.

In his pro per application for leave to appeal to the Michigan Supreme Court, petitioner raised three issues:

      I.      The court denied the motion to exclude the videotestimony . . . Although the video surveillance appears to be fine and without malfunction the admission of the video surveillance neglects the overwhelming prejudicial effect it has played. . . [1]

      II.      The court improperly allowed into evidence DNA for which no proper foundation had been laid in violation of MRE 703, MRE 401, 402, 403.

      III.      The trial court allowed into evidence hearsay of prior statements by the deceased.

Application for leave to appeal (docket no. 24). The Michigan Supreme Court denied petitioner's application. *People v. Rocafort*, No. 130468 (Mich. May 30, 2006).

Rocafort filed a handwritten "petition" for habeas corpus on July 10, 2006. *See* docket no. 1. The next day, petitioner filed a "supplement" on the court's pre-printed form § 2254 petition. *See* docket no. 2. The court accepted the "supplement" as the habeas petition. *See* docket no. 4. The habeas petition raised three issues:

---

[1] This issue appears to raise an insufficient evidence claim.

> I. Insufficiency of credible evidence that defendant's DNA was on the deceased's right hand fingernails.
>
> II. The trial court allowed over objection prejudicial hearsay from three witnesses pursuant to MRE 803(3).
>
> III. Insufficiency of credible evidence of intent to kill.

Petition (docket no. 2).[2]

## II. Standard of review under 28 U.S.C. § 2254

Petitioner seeks relief under 28 U.S.C. §2254, which provides that "a district judge shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Before petitioner may seek such relief in federal court, however, he must first fairly present the substance of his claims to all available state courts, thereby exhausting all state remedies. *Picard v. Connor*, 404 U.S. 270, 277-78 (1981); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994); *see* 28 U.S.C. §2254(b)(1)(A). Here, petitioner has exhausted all of the issues raised in his petition.

Where the state court has adjudicated a claim on its merits, the federal district court's habeas corpus review is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides in pertinent part that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication–

---

[2] The court has construed petitioner's rather cryptic claims by reviewing the narrative set forth in the original petition filed on July 10, 2006.

>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established Federal law if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided the case differently than a Supreme Court decision based upon a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *Lopez v. Wilson*, 426 F.3d 339, 341 (6th Cir. 2005) (*rehearing en banc*). An unreasonable application of clearly established Federal law occurs "when the state court identified the correct legal principle from the Supreme Court but unreasonably applied the principle to the facts of the case before it." *Id.*

A determination of a factual issue by a state court is presumed to be correct. 28 U.S.C. § 2254(e)(1). A habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence that the state court's determination was erroneous. *Magana v. Hofbauer*, 263 F.3d 542, 546-47 (6th Cir. 2001).

### III.  Petitioner's habeas claims

#### A.  Trial court improperly admitted testimony and evidence of DNA found under the deceased's fingernail.

First, petitioner contends that the trial court improperly admitted DNA evidence found under the victim's right hand fingernails by Michele Marfori, a forensic scientist at the State of Michigan forensic laboratory. Trial Trans. III at 90. By way of background, Ms. Marfori testified

4

that DNA analysis involved three steps: extraction (isolating the DNA); amplification (in which "we multiply 13 different regions of the DNA that vary between individuals that we look at" and insert a colored dye for later detection); and detection (the DNA fragments that we copy are separated out by size, and we use a system "which detects the colored dye, which is recorded as a data point, which is then assigned a DNA type"). *Id.* at 95. The 13 different regions of DNA examined by Ms. Marfori are the same 13 regions examined by the FBI in performing DNA testing. *Id.* at 100. Ms. Marfori testified that she extracted two types of DNA from the victim's right hand fingernail clippings. *Id.* at 102-3. The DNA types from the clippings matched the victim. *Id.* at 103. In addition, the DNA from the clippings matched petitioner at all 13 of the regions. *Id.*

Ms. Marfori testified that the amount of foreign DNA found the fingernail clippings, matching at all 13 locations, would not, in her opinion, be transferred "[j]ust by shaking hands." *Id.* at 105-6. When asked if such a transfer could occur through "casual contact," petitioner's counsel objected for lack of foundation on whether Ms. Marfori could testify about how the DNA got underneath the victim's fingernails. *Id.* at 106. The following exchange took place between the prosecutor and Ms. Marfori:

> Q. How long have you been doing DNA analysis?
>
> A. Over five years.
>
> Q. From everything you've read and from your experience, how frequently do you obtain foreign DNA, that is to say, DNA from other than the donor, the person whose fingernails they are, how often do you obtain foreign DNA on fingernails?
>
> A. From my experience, it's highly unlikely to get foreign DNA from a donor's own fingernail.
>
> Q. From your experience, is it common for people to have casual contact with foreign potential donors of DNA?

5

> A.     It is possible for casual contact to deposit other types of DNA, yes.
>
> Q.     But still within that context, where we all recognize we have some contact with each other, it's unusual for you to get DNA off of fingernails?
>
> A.     It's unusual in this case to get DNA types that are foreign at all 13 locations, with casual contact you could expect to get other types at just a few locations, but here they're -- it's consistent with a mixture of Heather Travis and Mr. Rocafort at all 13 locations.
>
> Q.     Well, may I ask this question, then: The fact that you have it at all 13 locations, what does this tell you abut the nature of the contact she had with Mr. Rocafort?
>
> A.     Again, I don't know how the DNA was deposited there, but there's enough DNA present that it's in high enough amounts to detect at all 13 locations.
>
> Q.     Does this tell you anything about the nature of the contact?
>
> [Defense Counsel]:    Objection, your Honor, she just testified that she doesn't know how --
>
> [The Court]:    I'm going to allow the answer to that question. Overruled. Go ahead.
>
> A.     Well, in my opinion, this would be more than casual contact.
>
> Q.     Is it consistent, which is the question I asked earlier, is it consistent with a fighting situation?
>
> A.     It is possible. I don't know based on what I do.
>
> [The Court]:    Let's move on.

*Id.* at 107-08. After this testimony, petitioner's counsel did not object to the admission of charts summarizing the DNA results. *Id.* at 109-110.

Based on a statistical analysis, Ms. Marfori testified that the DNA test results would exclude "about 99.99" percent of the Caucasian, African-American and Hispanic populations as

contributors to this DNA sample taken from the victim's fingernails. *Id.* at 103-04. Ms. Marfori concluded that "the probability of choosing an individual at random that could be a contributor to the mixture would be one in 2.4 million for the Caucasian population, one in 881.7 thousand in the African-American population, and one in 3.7 million for the Hispanic population." *Id.* at 104.

In his direct appeal, petitioner contended that the trial court improperly admitted the fingernail DNA evidence and urged the appellate court to apply the analysis for evaluating unidentified DNA as set forth in *People v. Coy*, 243 Mich. App. 283, 620 N.W.2d 888 (2000). The Michigan Court of Appeals summarized the analysis used in *Coy* as follows:

> A forensic serologist testified that blood samples on a knife and a doorknob were from more than one person. Although the serologist could not positively identify to whom the blood belonged, she testified that neither the defendant nor the victim could be excluded as a possible contributor. [*Coy*, 243 Mich. App. at 292-293]. This Court stated that the record was "devoid of any supplemental probability or statistical analysis giving meaning to the fact of the potential DNA match, i.e. to what extent was it likely that defendant represented an individual who contributed to the mixed sample." *Id.* at 297. We determined that the evidence was not properly admitted because without some interpretive evidence regarding the likelihood or significance of the match, the testimony was not admissible expert testimony under MRE 702. *Id.* at 301-302. Further, we held that the evidence should have been excluded under MRE 403 because without evidence of the significance of the potential match the evidence was unfairly prejudicial. *Id.* at 302-303. Thus, we determined that the admission of the testimony resulted in clear, outcome-determinative error, in part because the prosecutor improperly argued that the evidence showed that the defendant's blood was on the knife. The DNA evidence was the only evidence that placed the defendant at the victim's apartment at the time of the murder in an otherwise weak case; therefore, he was awarded a new trial. *Id.* at 313-314.

*Rocafort*, No. 257031, slip op. at 3.

After reviewing the *Coy* analysis, the Michigan Court of Appeals concluded that the trial court did not commit error by admitting the DNA evidence at petitioner's trial:

> Defendant also asserts that we should apply the *Coy* analysis to find error occurred in the admission of testimony that defendant's DNA under the victim's

7

>fingernail was a result of more than casual contact. But the expert testified that it was highly unlikely to find a DNA match at all thirteen points from mere casual contact. Although she did not employ statistics, the expert's standard that is "highly unlikely" helped the jury understand the significance of the evidence, which satisfied the requirements of *Coy*. Further, the testimony met the requirements of MRE 703 because the facts that formed the basis of her opinion, i.e. the match at all thirteen points, were in evidence. Because the testimony was highly relevant to establish defendant caused the victim's death, the trial court did not abuse its discretion by admitting the evidence.

*Id.*, slip op. at 4.

Respondent contends that this is an evidentiary issue not cognizable on habeas review. The court agrees. Federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[F]ederal habeas corpus relief does not lie for errors of State law." *Id.* at 67, *quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). States have broad authority to promulgate rules that exclude evidence provided that [the rules] are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Baze v. Parker*, 371 F.3d 310, 323-24 (6th Cir. 2004), *quoting United States v. Scheffer*, 523 U.S. 303, 308 (1998). To violate due process, state court rulings must "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (internal quotations and brackets omitted). Consequently, state court rulings on the admission of evidence are not subject to federal habeas review unless the error denied petitioner a fundamentally fair trial. *Clemmons*, 34 F.3d at 357-358; *see Estelle*, 502 U.S. at 67-70. *See Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) ("[e]rrors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial"). Furthermore, when reviewing a state court's

evidentiary determination pursuant to § 2254, a federal court may not grant relief unless the petitioner is able to show that the state trial court's evidentiary rulings were in conflict with a decision "reached by [the Supreme] Court on a question of law or if the state court [decided the evidentiary issue] differently than [the Supreme] Court [did] on a set of materially indistinguishable facts." *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000), *quoting Williams v. Taylor*, 529 U.S. 362, 413 (2000).

Petitioner has failed to demonstrate that the admission of this DNA evidence denied him a fundamentally fair trial. The Michigan Court of Appeals distinguished the *Coy* opinion and held that Ms. Marfori's opinion was properly admitted evidence under the Michigan Rules of Evidence. The state courts are the ultimate expositors of state law in federal habeas proceedings. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68. The record reflects that the expert's opinion was consistent with her experience. While she testified that the DNA evidence established more than casual contact, she admitted that she did not know whether the amount of DNA was consistent "with a fighting situation." Furthermore, petitioner has failed to demonstrate that the state court ruling conflicts with a decision reached by the Supreme Court on materially indistinguishable facts. Admission of Ms. Marfori's testimony regarding the DNA evidence did not deprive petitioner of a fundamentally fair trial. Petitioner's claim should be denied.

### B. Deceased victim's statements

Next, petitioner contends that the trial court improperly admitted statements that the deceased victim made to others. The Michigan Court of Appeals addressed this issue as follows:

> First, defendant argues that the trial court abused its discretion when it admitted hearsay testimony from the witnesses regarding the victim's statements

9

about defendant. Further, defendant argues that even if the evidence satisfied a hearsay exception, it was irrelevant and more prejudicial than probative. We disagree.

Several witnesses testified that the victim had previously told them that defendant had made unwanted sexual advances toward her and that she said she did not like defendant: she thought he was "creepy," and that she would never become sexually involved with him. Defendant claims that this evidence is inadmissible hearsay and even if it is within a recognized exception, it should have been excluded under MRE 403 because of its prejudicial effect.

MRE 803(3) states the following is not excluded by the hearsay rule.

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

We conclude all of victim's hearsay statements fall within this exception. The victim's statements were not of things she remembered or believed; rather, they reflected how she felt at that time about defendant. The evidence was relevant to the prosecutor's theory that defendant's motive for committing the crime was the victim's repeatedly rebuffing his sexual advances. It was not necessary for the victim's state of mind to be at issue for the trial court to admit such evidence. *People v. King*, 215 Mich. App 301, 309; 544 NW2d 765 (1996).

Additionally, the evidence was not unfairly prejudicial in light of its probative value. MRE 403 states that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." All evidence is prejudicial to some extent. *People v. Mills*, 450 Mich. 61, 75; 537 NW2d 909 (1995), mod on other grounds 450 Mich. 1212 (1995). Unfair prejudice results only if marginally probative evidence is likely to be given undue weight by the jury or the probative value is substantially outweighed by the danger of unfair prejudice. *Id.* Here, the testimony was probative of defendant's motive. Motive was particularly relevant because the victim and defendant had frequent contact in the days before her death. Although witnesses testified that the victim did not like defendant, the security video and other testimony showed that the victim voluntarily spent time with defendant in the days preceding her death. Therefore, the jury was not likely to give undue weight to the testimony that would result in unfair prejudice.

*Rocafort*, No. 257031, slip op. at 2-3.

10

Respondent contends that this is an evidentiary issue not cognizable on habeas review. Again, the court agrees. As previously discussed, state court rulings on the admission of evidence are not subject to federal habeas review unless the error denied petitioner a fundamentally fair trial. *Estelle*, 502 U.S. at 67-70; *Clemmons*, 34 F.3d at 357-358. In his direct appeal, petitioner challenged the admission of the evidence on the basis of state evidentiary law. The Michigan Court of Appeals set forth its reasoning for rejecting petitioner's challenge of these statements under an exception to the state's applicable the hearsay rule, MRE 803(3). It is not for this court to reexamine that determination. *Estelle*, 502 U.S. at 67-68. Petitioner has failed to demonstrate that the state court ruling conflicts with a decision reached by the Supreme Court on materially indistinguishable facts. Accordingly, petitioner's claim should be denied.

### C.    Sufficiency of the evidence

Finally, petitioner contends that his conviction is not supported by sufficient evidence. The Michigan Court of Appeals addressed this issue as follows:

> [D]efendant argues that there was insufficient evidence to convict him of the crime charged. We disagree.
>
> We review a claim of insufficient evidence by viewing the evidence in a light most favorable to the prosecution and determining whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v. Wolfe*, 440 Mich. 508, 515; 489 NW2d 748 (1992), amended 441 Mich. 1201 (1992). A trier of fact may make reasonable inferences from direct or circumstantial evidence to find all of the elements of an offense beyond a reasonable doubt. *People v. Carines*, 460 Mich. 750, 757; 597 NW2d 130 (1999).
>
> The essential elements of first-degree premeditated murder are that defendant killed the victim and that the killing was "willful, deliberate, and premeditated." MCL 750.316(1)(a); *People v. Bowman*, 254 Mich.App 142, 151; 656 NW2d 835 (2002). Defendant argues that there was insufficient evidence to show that he killed the victim or that he acted with premeditation. But the prosecutor presented both video and testimonial evidence upon which a fact-finder could have reasonably

> concluded that the victim went into defendant's apartment, after which she was never seen alive again. The victim was found in a wooded area behind the apartment complex where both defendant and the victim lived. Defendant's DNA was found under the victim's fingernail, and the victim had defensive wounds. The prosecutor also presented evidence that defendant had a motive for the crime. Viewing the evidence in a light most favorable to the prosecution, it was sufficient to permit a rational jury to find beyond a reasonable doubt that defendant killed the victim.
>
> Premeditation requires sufficient time for the perpetrator to take a second look and may be inferred from all of the circumstances surrounding the killing. *People v. Coy*, 243 Mich.App 283, 315; 620 NW2d 888 (2000). Here, the jury heard testimony that the victim suffered two non-fatal blows to the head with a blunt object before she died that rendered her unconscious. Further, the medical examiner testified that the cause of death was strangulation, which would have taken three to four minutes. Also, he testified that the victim's hands were bound while she was still alive. Viewing all of the evidence in a light most favorable to the prosecution, it was sufficient for a reasonable jury to conclude beyond a reasonable doubt that defendant premeditated and deliberated before killing the victim. Defendant essentially argues that the individual pieces of evidence do not support his conviction. However, defendant's arguments pertain to the weight of the evidence, which is a question for the jury. *People v. Fletcher*, 260 Mich.App 531, 561; 679 NW2d 127 (2004). Because sufficient evidence supported his conviction, we conclude that defendant's claim that the trial court erred in denying his motion for directed verdict is without merit.

*Rocafort*, No. 257031, slip op. at 1-2.

In *In re Winship*, 397 U.S. 358 (1970), the Supreme Court held that Fourteenth Amendment's Due Process Clause protects a criminal defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364. Sufficient evidence supports a conviction if "after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis added). In evaluating a sufficiency of the evidence claim, the court views both direct evidence and circumstantial evidence in the light most favorable to the prosecution, drawing all available inferences and resolving all issues of credibility in favor of the factfinder's

verdict. *United States v. Rayburn*, 495 F.3d 328, 337-38 (6th Cir. 2007). The reviewing court must presume that the trier of fact resolved conflicting inferences of fact in favor of the prosecution, and must defer to that resolution. *Wright v. West*, 505 U.S. 277, 296-97 (1992).

Viewing the evidence in the light most favorable to the prosecution, the court concludes that the government presented sufficient evidence to convict petitioner. The victim lived alone in an apartment directly above petitioner's apartment. Trial Trans. II at 47. The jury heard testimony that the victim told some acquaintances that she was afraid of petitioner and did not like him. Ms. Stuthard testified that three to four months before the murder, the victim "basically told me that she was afraid of him, that he would make comments that she was afraid of" and that the victim would sneak out the back of the building instead of the front so that she would not have to confront him. Trial Trans. IV at 60. Another witness, Ms. Salicina, testified about the victim's feelings toward petitioner:

> She didn't like him. She said that he always used to um, like harass her to do sexual things with him and, um, offered -- she told me before that he offered her money for -- if she'd suck his dick, if she would suck his dick, $20, "If you give me 20 -- or I'll give you $20 if you suck my dick . . . She said she hated him, couldn't stand him, he was always bothering her. I said, "You didn't do it did you," and she's like, "No, it's nasty."

Trial Trans. IV at 111-12. In addition, Elizabeth Mulder testified that she was a friend of the victim. Trial Trans III at 32-33. According to Mulder, the victim spoke jokingly of a man who "lived below her" and "that he wanted oral sex in exchange for drugs and/or money, and she said he was creepy, and there's no way she would do that, which she has done for other people, but she wouldn't do it for him." *Id.* at 34.

Carrie Hernandez, a manager of the apartment complex, testified that the victim had lived there since June 1998, and that petitioner moved into his apartment in December 2002. Trial

13

Trans. II at 38, 43-44. Kim Cross, chief operating officer of the apartment complex's manager, testified that petitioner called her on September 22, 2003 regarding the victim. *Id.* at 169-70. During the conversation, petitioner stated his concern about the victim and the people visiting her because he had placed a complaint with the police department regarding "noise and possible drugs" that led to her arrest. *Id.* at 170-71. The apartment management was in the process of evicting the victim in October 2003 based upon her arrest for possession of marijuana. *Id.* at 43-46, 171-72.

Despite having reported the victim to the police for possible drug use, petitioner wrote two checks to the victim for the purchase of crack cocaine on October 16, 2003. Trial Trans. IV at 20-34. The victim cashed the first check at 1:00 p.m. with her crack dealer, Roy Daniels, and returned to petitioner's apartment. *Id.* The victim cashed the second check with Roy Daniels and returned to petitioner's apartment with the crack at about 2:12 p.m. *Id.*[3] Roy Daniels never saw the victim alive after that time. *Id.* at 35. Daniels went to petitioner's apartment a few days later, at which time petitioner asked Daniels if he had ever slept with the victim and then called her a whore or a slut. *Id.* at 36-37.

The apartment video security system identified the victim returning to petitioner's apartment alone after she returned from the second trip to the bank. In over 200 hours of video security tape from October 15, 2003 through October 18, 2003, the victim is never seen leaving petitioner's apartment. Trial Trans. III at 125-27; IV at 211-32. Telephone records indicate that petitioner and the victim exchanged five telephone calls on October 16, 2003. Trial Trans. III at 37-45. Petitioner called the victim at 2:50 p.m. *Id.* at 45. Christopher Travis testified that he saw the

---

[3] Jane Meyer, a security officer from Independent Bank, testified that the transactions for two checks from petitioner to the victim were presented to the bank branch at 1:00 p.m. and 2:12 p.m. on October 16th. Trial Trans. II at 191-99.

14

victim knocking on petitioner's apartment door at about "2:40-ish" on October 16th, as he was taking another neighbor to work. Trial Trans. IV at 76-78. The victim was seen leaving her apartment for the last time on a video security camera at 2:51 p.m. *Id.* at 212, 219.

The video surveillance depicted petitioner engaging in unusual activity over the next 48 hours. At 8:35 p.m. that evening, petitioner left through the back door and re-entered the building five minutes later. *Id.* at 213-14. Petitioner left the building seven times during the early morning hours of October 17th: 12:16 a.m.; 2:27 a.m.; 3:15 a.m.; 4:43 a.m.; 4:59 a.m.; 5:11 a.m.; and 6:57 a.m. Id. at 219-22. During this time, he left the building for short periods of time, made three trips toward the apartment complex's dumpster area, and also left for 38 minutes with his bicycle at 2:27 a.m. *Id.* At 7:40 a.m., petitioner left the front door with what appeared to be a laundry basket on his shoulder, heading toward the laundry area. *Id.* at 223.

The next notable surveillance video occurred at 11:57 p.m., when petitioner left the building, walking west in the direction of the dumpster with something in his hand. *Id.* at 226. The next morning (October 18th), petitioner left the rear door at 7:00 a.m. for approximately four minutes. *Id.* at 228. About three-quarters of an hour later, at 7:52 a.m., petitioner left the front door with a bag, walking to the west. *Id.* While at the rear of the building, petitioner looked to the south for about 40 seconds, which gave him a view of the woods where the victim's body was found. *Id.* at 228-29. Later that afternoon, at 4:35 p.m., petitioner left the rear door walking to west with a white bag. *Id.* at 230-31. He returned two minutes later without the bag. *Id.*

Officer Jeff Rowley responded to a call on October 19th, at about 4:30 p.m., regarding a possible deceased body. Trial Trans. II at 174-75. The body was found by some children in a wooded area behind the apartment complex, body was found 164 feet from petitioner's

15

apartment window. *Id.* at 30-33, 118-20, 174-76. The victim's hands and feet were bound. *Id.* at 177-78. The Michigan State Police investigated and photographed the victim's body later that day. *Id.* at 30-33, 118-20.

Dr. Stephen Cohle performed the autopsy. Trial Trans. IV at 157-61. He identified the decedent as 5'9" tall, weighing 119 pounds and 27 years old. *Id.* at 161-2. The doctor testified that the victim was bound while either alive or shortly after her death. *Id.* at 165. The victim had signs of potential defensive injuries. *Id.* at 166-68. The doctor opined that she had been dead for at least 24 hours. *Id.* at 172. The victim had non-fatal injuries to her head that may have dazed her or knocked her out. *Id.* at 176-78. The doctor concluded that the cause of death was asphyxia by strangulation. *Id.* at 182. He further stated that it would take about three to four minutes of continual pressure around the neck to cause death. *Id.* at 187.

Police Office Derek Haan responded to the site and recognized the victim's body. *Id.* at 202-3. Haan canvassed the apartment complex, knocking on doors and asking if the residents had seen or heard anything in the last few days. *Id.* at 204-5. Haan testified that petitioner's response stood out. *Id.* at 205. Specifically, when the officer told petitioner that the police found the victim's body, petitioner became extremely nervous and stuttered giving his name, date of birth and telephone number. *Id.* at 203-07. When told it was the victim's body, petitioner became upset, started shaking, stated that he had not seen anything, had not heard anything, shut the door and locked it. *Id.* He was the only neighbor with this type of reaction. *Id.* at 207.

Jessica Heeringa, a cashier at a local convenience store, testified that petitioner came to the store on October 20th. *Id.* at 214-18. Heeringa remembered petitioner because he came in "very nervous and shaky and sweaty." *Id.* at 217. Heeringa had lived at the apartment complex and

16

knew the victim. *Id.* at 218. When asked what was significant about the conversation, Heeringa responded:

> Just that [petitioner] was very nervous, and when I asked him if he knew Heather, he told me no, and he asked me if I did, and I said yes, and he asked me when the last time I seen her was, and I said on Thursday, and he just started shaking and sweating, he couldn't write his check, he was shaking really bad. That's the biggest thing that got me. And then he stepped back, I put his stuff in a bag, and I cashed out his order, and he stepped back and stood at the register and told me that if the cops came back to his house to question him again, that he was going to tell them my name and tell them that I was the last person who seen her alive, and he kept saying that over and over, that he was going to tell the cops that I was with her, and so that kind of made me nervous. That's why I decided to call and let them know about the situation.

*Id.* at 219-20. Heeringa understood petitioner's comments to mean that "he was trying to blame me" for the murder. *Id.* at 223.

As previously discussed, Ms. Marfori testified that petitioner's DNA was found on the victim's fingernails under circumstances which indicated that petitioner and victim had more than "casual contact." In addition, Ms. Marfori identified DNA found at 7 of 13 loci (regions) on the white string that bound the victim's ankles, that this "mixed" DNA contained markers from both the victim and petitioner, and, as result, she was unable to exclude petitioner as a donor. III at 99-102.

Viewing this evidence in the light most favorable to the prosecution, the court concludes that the evidence was sufficient to enable any rational trier of fact to convict petitioner of the crime of first degree murder. *Jackson*, 443 U.S. 307 at 319; *Winship*, 397 U.S. at 364. Prior to her disappearance, the victim told two or three people that she had rebuffed petitioner's sexual advances and found him "creepy." The victim was seen entering petitioner's apartment on the afternoon of October 16th after purchasing crack paid for by petitioner. The victim never appeared

17

on the surveillance tape after that time. Petitioner engaged in rather unusual activity during the early morning hours of October 17th, making three trips in the direction of the dumpster and doing laundry. Petitioner was also seen carrying a bag in the direction of the woods where the victim's body was found. Petitioner's DNA was found under the victim's fingernails, and his DNA could not be excluded from the string binding her ankles. Finally, petitioner acted particularly nervous when questioned by police and made incriminating comments to a cashier who knew the victim.[4] "[C]ircumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *Rayburn*, 495 F.3d at 338.

The Michigan Court of Appeals' decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254 (d). Accordingly, petitioner is not entitled to relief on this claim.

---

[4] Furthermore, the court notes that petitioner apparently gave a six hour statement to the authorities given on October 22, 2003, immediately prior to his arrest. This statement was set forth in a videotape and admitted without objection as Exhibit 49. *See* Prosecutor's Brief on Appeal at fn. 3 (docket no. 23); Trial Trans. V at 12-15, 25-29, 33; Trial Trans. VI at 3. While quoted portions of this exhibit appeared in the prosecutor's appellate brief, the contents of the exhibit are not set forth in the trial transcript and respondent's counsel has not included this exhibit in the Rule 5 materials. Based upon the quotes as set forth in the appellate brief, this exhibit contained extensive incriminating statements that would provide additional evidence in support of the conviction. However, for the reasons stated above, the court concludes that the prosecution provided sufficient evidence even without consideration of Exhibit 49.

### V.    Recommendation

I respectfully recommend that petitioner's habeas petition be **DENIED**.  Rule 8, Rules Governing § 2254 Cases in the United States District Courts.

Dated:  May 6, 2009                             /s/ Hugh W. Brenneman, Jr.
                                                HUGH W. BRENNEMAN, JR.
                                                United States Magistrate Judge

ANY OBJECTIONS to this Amended Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).